CR Industries, plaintiff v. United States, defendant

Court No. 83-2-00244

Before Tsoucalas, *Judge.*

Opinion and Order

(Dated August 19, 1986)

Schnader, Harrison, Segal and Lewis (*Saul L. Sherman* and *Dennis A. Adelson*) for the plaintiff.

*Richard K. Willard,* Assistant Attorney General; *Joseph I. Liebman,* Attorney in Charge, International Trade Field Office, Commercial Litigation Branch, Civil Division, Department of Justice (*Saul Davis*) for the defendant.

Tsoucalas, *Judge*: This action is before the Court, pursuant to Rule 56, on plaintiff's motion for summary judgment. The dispute arises over the classification of plaintiff's merchandise, a thin-walled wear sleeve and accompanying protective metal cup. Plaintiff argues that the proper classification is as an entirety under

Schedule 6, Part 6, Subpart B

Chassis, bodies (including cabs), and parts of the foregoing motor vehicles:

692.32\*   Other................................... 3.9% ad val.

\*previously 692.27 ............................... 4.0% ad val.

Customs classified the components of the merchandise as follows:

*Wear Sleeve:*

Schedule 6, Part 4

681.39\*   Machinery parts not containing electrical features
           and not specially provided for ........... 9.0% ad val.

\*previously 680.90 ............................... 9.5% ad val.

*Cup:*

Schedule 6, Part 3

Hand tools (including table, kitchen, and household implements of the character of hand tools) not specially provided for, and metal parts thereof:

651.47   Other:
              Of iron or steel:
                 Other ............................... 8.1% ad val.

Statement of Facts

Plaintiff, CR Industries ("CR"), is the exclusive importer of merchandise, known as Speedi-Sleeve kits (or simply Speedi-Sleeve), consisting of a thin stainless steel wear sleeve and a carbon steel cup which fits over the sleeve. The sleeves are used to repair worn shafts

on various types of vehicles. The cups are packaged with the sleeves and serve a dual purpose: they protect the sleeves while in transit and are used as tools to install the sleeves on the shafts. After use in installation, the cups are discarded.

Plaintiff, through the affidavit of its customs broker, asserts that it was the sole importer of the merchandise which was liquidated almost exclusively at the Port of Blaine, Washington, from 1969 through 1980.[1] During that time, plaintiff alleges that the Speedi-Sleeve kits were uniformly classified[2] as entireties under the provision for "parts of the foregoing motor vehicles" as stated in item 692.32, TSUS. On July 23, 1980, the import specialist at Blaine issued a notice of rate advance reclassifying the sleeve under "machinery parts not containing electrical features and n.s.p.f." and classifying the cup as "other hand tools of iron or steel." Plaintiff sought a ruling from Customs Headquarters and on October 27, 1981, the Director of the Classification and Value Division affirmed the classification made at Blaine. Customs also declined to rule on plaintiff's claim that a uniform existing practice ("UEP") was in effect with regard to the merchandise claiming that insufficient data was presented to adequately address the issue. Plaintiff filed timely protests as to the classification of the sleeve and cup components as entireties and upon their denial commenced this action against the defendant, the United States.

## Issues Presented

I. Does this Court have jurisdiction over

A. plaintiff's claim concerning the classification of the cup and sleeve components of the importations; and

B. plaintiff's claim, pursuant to 19 U.S.C. § 1315(d), concerning the existence of a uniform existing practice, established by virtue of consistent liquidation of Speedi-Sleeve from 1969 to 1980?

II. Does the Speedi-Sleeve kit, as a matter of law, constitute an entirety within the meaning of the tariff laws?

III. Is the merchandise, as a matter of law, properly classified as "parts of foregoing motor vehicles" under item 692.32, TSUS?

## Discussion of Law

### I. *Jurisdiction*

A. This Court has jurisdiction over plaintiff's claims regarding both the cup and sleeve components.

It is fundamental that the existence of a jurisdictional predicate is a threshold inquiry in which plaintiff bears the burden of proof. *See*

---

[1] Plaintiff also admits that a "few urgent air shipments" entered at the port of Seattle and Chicago. *Plaintiff's Reply Memorandum* at 23.

[2] Plaintiff claims not to have actual records of the entries made during the years in question and relies on the statement of its affiant. Defendant, through the affidavit of its attorney, claims to be unable to secure the relevant records from Customs. *Defendant's Memorandum,* Davis Affidavit at 2.

*McNutt* v. *General Motors Acceptance Corp.*, 298 U.S. 178, 189 (1936); *S.S. Kresge Co.* v. *United States*, 68 Cust. Ct. 367, 370 C.R.D. 72–8, 340 F. Supp. 1404, 1407 (1972). Pursuant to 19 U.S.C. § 1514(c)(2) and 28 U.S.C. § 1581(a), in order for this Court to acquire jurisdiction, the importer must file the requisite protest within 90 days of notice of liquidation. Section 1514(c)(1)[3] regulates the form and content of that document. It requires, *inter alia,* particularized reference to the decision contested and the nature of each objection. In this action, the jurisdictional issues center on the sufficiency of plaintiff's protest.

It is often written that "at the time he makes his protest the importer must have in mind the objection afterwards made at the trial." *Mattel, Inc.* v. *United States,* 72 Cust. Ct. 257, 260–61, C.D. 4547, 377 F. Supp. 955, 959 (1974) quoting *United States* v. *Sheldon & Co.,* 5 Ct. Cust. Apps. 427, 429, T.D. 34946 (1914). Further, the protests do not require technical precision, *National Carloading Corp.* v. *United States,* 44 Cust. Ct. 493, Abs. 64258 (1960), and need only "when fairly construed * * * show * * * that it was sufficient to notify the collector of its true nature and character * * *." *American Mail Line, Ltd.* v. *United States,* 34 CCPA 1, 6, C.A.D. 335 (1946) quoting *Davies* v. *Arthur,* 96 U.S. 148, 151 (1878).

In this action, the defendant contends that plaintiff's protests are jurisdictionally defective as to the cup because they fail to expressly raise the issue of the classification of that component. Plaintiff's protests refer to the "classification of the sleeve repair kits" or in some cases to simply "classification of the sleeves."[4] It is fairly clear that plaintiff must have envisioned the objection now asserted before the Court at the time of the protest because plaintiff had previously raised the issue in its communications with Customs in 1981 when it claimed the entire kit was dutiable as an entirety under the provision for motor vehicle parts.

The only remaining question is whether the protest can be said to fairly apprise Customs of the claimed objection. I hold that plaintiff's protests, fairly read, do adequately inform Customs of the objection made. *See J. Ray McDermott & Co.* v. *United States,* 69 Cust. Ct. 197, 201–02, C.D. 4394, 354 F. Supp. 280, 283 (1972), *appeal dismissed,* 60 CCPA 185 (1973) (protest as to oilwell platform jacket encompasses entity consisting of jacket and girder). In any event, it must be noted that plaintiff has never offered an alternative classifi-

---

[3] Section 1514(c)(1) provides in pertinent part that a protest should set forth "distinctly and specifically each decision described in subsection (a) of this section as to which protest is made; each category of merchandise affected by each such decision as to which protest is made; and the nature of each objection and reasons therefor." 19 U.S.C. § 1514(c)(1) (1982).

[4] *See, e.g.:*
Protest No. 30042
Entry No. CE 80–185443–9 of 6/25/80
We herewith protest the classification of the sleeves under TSUS 681.39. The proper classification should be 692.32 as the articles are chiefly used as parts of vehicles.
Further information will be supplied at a later date.
Protest No. 30042
Entry No. CE 80–187432–5 of 9/24/80
We herewith protest the classification of the sleeve repair kits under TSUS 681.39. The proper classification should be 692.32 @ 3.9% since the kits are chiefly used as parts of vehicles.
Supplemental information will be supplied at a later date.

cation for the cup at any stage from the filing of its protests through the recent oral argument on the motion for summary judgment. Presumably, it accepts the idea that if the cup and sleeve do not form an entirety, then the cup is separately dutiable as a hand tool. Nevertheless, plaintiff is bound by that determination, if it is incorrect on the entireties issue, since it has failed to prove that the cup is properly classifiable in any other tariff provision. *See* 28 U.S.C. § 2639(a)(1) (1982).

B. This Court does not have jurisdiction over plaintiff's claim of the existence of a uniform existing practice (UEP).

There is no need to recite the legal principles enunciated in Part A. It is sufficient to note that there is no possible way to read the language of plaintiff's protest so as to conclude that plaintiff was raising this claim. *See Silvine Importers, Inc.* v. *United States*, 59 Cust. Ct. 355, 357, C.D. 3168 (1967). Protest as to classification, such as that in the instant case, does not, by itself, constitute protest as to the UEP. *See Beck Distributing Corp.* v. *United States*, 77 Cust. Ct. 158, 160, C.R.D. 76–7 (1976); *Bauer Alphabets, Inc.* v. *United States*, 54 Cust. Ct. 255, 263, C.D. 2540 (1965).

This Court is unwilling to vitiate the protest requirements mandated by Congress, *see* 19 U.S.C. § 1514(c)(1), in the guise of endorsing a liberal construction of protests. *See Audiovox Corp.* v. *United States*, 8 CIT 233, 235 n.6, 598 F. Supp. 387, 389 n.6 (1984), *aff'd on opinion below*, 764 F.2d 848 (Fed. Cir. 1985). *See also Gray Tool Co.* v. *United States*, 6 CIT 333, 334 (1983) (under § 1514(a) protest as to appraisement is not protest as to classification). This position is in accord with that of a recent decision of the Federal Circuit which, while acknowledging the principle that protests are to be liberally construed, explained:

> This does not, however, mean that protests are akin to notice pleadings and merely have to set forth factual allegations without providing any underlying reasoning * * *. "A protest must be sufficiently distinct and specific to enable the Customs Service to know what is in the mind of the protestant." (citation omitted)

*Computime, Inc.* v. *United States*, 8 CIT 259, 601 F. Supp. 1029 (1984) *aff'd*, 772 F.2d 874, 878–79 (Fed. Cir. 1985).

Plaintiff may not take advantage of 28 U.S.C. § 2638 (1982) because the UEP claim is not a "new ground" being asserted for the first time before this Court. Instead, plaintiff argues that the protest regarding classification encompasses the claimed UEP. Alternatively, it contends that since Customs was made aware of the issue in connection with the internal advice ruling, it may not disclaim knowledge of the alleged UEP, and the Court may assert jurisdiction despite any deficiency in the protest. However, even if this argument were to otherwise command support in the law, to now allow the UEP claim to be asserted given that Customs specifically in-

formed plaintiff that it declined to decide the issue due to insufficient information would both drain the protest requirements of meaning and be prejudicial to defendant. Plaintiff's approach would thwart the scheme of orderly claim assessment envisaged by § 1514 since Customs was deprived of a chance to review the UEP issue prior to the denial of the protest. *Cf. Old Republic Insurance Co.* v. *United States*, 8 CIT 1, 3 (1984). The lack of notice in the protest may have led Customs to believe that the issue had been abandoned. Moreover, knowledge that the claim was being actively asserted may have allowed Customs to more adequately investigate any evidence of actual importing practice. Therefore, not having raised the issue in a timely protest, plaintiff is now precluded from raising it before this Court. *Cf. United States* v. *Parksmith Corp.*, 62 CCPA 76, 82, C.A.D. 1149, 514 F.2d 1052, 1057 (1975).

II. The cup and sleeve components of the Speedi-Sleeve kit do not form an entirety for tariff classification purposes.

The doctrine of entireties allows an item consisting of several components, which may or may not be susceptible of use in individual pieces, to be dutiable at one rate. *See Miniature Fashions, Inc.* v. *United States*, 54 CCPA 11, 14–15, C.A.D. 894 (1966). It is a concept that seeks to make tariff classifications responsive to the realities of commercial practice. *See Donalds, Ltd.* v. *United States*, 32 Cust. Ct. 310, 314, C.D. 1619 (1954).

In order to label importations an entirety, the components must together form a complete article of commerce and the identity of individual parts must be subordinated to that of the whole. *See E.M. Stevens Corp.* v. *United States*, 56 Cust. Ct. 494, 499–500, C.D. 2687, *appeal dismissed*, 53 CCPA 155 (1966). The mere fact that the components are imported together and a portion of the merchandise serves a protective function with respect to another portion, does not, under prior case law, compel the finding that the merchandise is dutiable as an entirety. *See United States* v. *Hensel, Bruckmann & Lorbacher, Inc.*, 22 CCPA 281, T.D. 47330 (1934) (leather carrying cases and binoculars not entireties); *United States* v. *E. Leitz, Inc.*, 22 CCPA 277, T.D. 47329 (1934) (wood and paper cases and microscopes not entireties). The key is that the components of the entirety should be designed to be or be capable of assembly so that the resulting article is new with a different character or use. *Hensel*, 22 CCPA at 285. The components of the entirety should function together; it is not enough that one component merely enhances the value of another. *See Lafayette Radio Electronics Corp.* v. *United States*, 57 CCPA 62, 65–66, C.A.D. 977, 421 F.2d 751, 753–54 (1970). In *Lafayette*, the Court held that a leather carrying case and the radio it was designed to accommodate was an entirety because the radio was designed to function and actually did function in the case. *Lafayette*, 57 CCPA at 66; 421 F.2d at 754. The fact that the radio could be operated without the case did not prevent the importation from being

termed an entirety. At the same time, the fact that the case protected the radio unit was itself insufficient to create an entirety. *Id.*

This stands in distinction to the merchandise in the instant case. The cup component serves a protective function during transport of the sleeve, and serves as a tool to install the sleeve on worn shafts. Nevertheless, it is discarded prior to the actual use on the sleeve and never operates in conjunction with the sleeve. *Cf. United States v. Kronfeld, Saunders, Inc.,* 20 CCPA 57, 60, T.D. 45679 (1932) (bracelet mountings and diamonds actually used to form a new article—a bracelet—constitute an entirety). The fact that the two components are actually imported together, and that the cup is unlikely to be used alone, is certainly relevant to the entireties question. Notwithstanding those factors, it remains true that the two components are never affixed or attached together nor do either of them lose their individual identities in favor of a new article. *See United States v. Altray Co.,* 54 CCPA 107, 110, C.A.D. 919 (1967); *E.M. Stevens Corp. v. United States,* 49 Cust. Ct. 203, 204, Abs. 66971, *reh'g denied,* 49 Cust. Ct. 270, Abs. 67137 (1962).

The parties and the Court agree that there is no material factual issue as to the components of the merchandise or to the manner in which they function in relation to each other. This makes the entireties question ripe for determination by way of summary judgment. *See Amorient Petroleum Co. v. United States,* 9 CIT 197, 607 F. Supp. 1484, 1487 (1985); *Cf. S.S. Kresge Co. v. United States,* 77 Cust. Ct. 154, 155, C.R.D. 76–6 (1976) (summary judgment denied where issues existed as to identity of the components and as to their use together). Therefore, it is the holding of this Court that the merchandise cannot constitute an entirety for tariff classification purposes, since the cup is discarded after installation of the sleeve and never operates in conjunction with the sleeve.

III. There is no material issue of fact as to whether the importations belong to the class or kind of wear sleeves and as to whether the chief use of the class or kind is in the vehicles referred to by item 692.32, TSUS.

The principal substantive issue is whether the Court may hold, as a matter of law, that the sleeve component is properly classifiable in a given parts provision.[5] In this regard, the tariff schedules offer the following guidance:

General Interpretative Rule 10(ij):

> (ij) a provision for "parts" of an article covers a product solely or chiefly used as a part of such article, but does not prevail over a specific provision for such part.

---

[5] At the hearing on the motion for summary judgment, defendant withdrew its argument that, as a matter of law, the sleeve compound was classifiable as "parts of non-electrical machinery" in item 681.39, TSUS, based on Schedule 6, part 4, headnote 1(v):
　　1. This part does not cover—
　　　　(v) articles and parts of articles specifically provided for elsewhere in the schedules.

General Interpretative Rule 10(e)(i):

> (i) a tariff classification controlled by use (other than actual use) is to be determined in accordance with the use in the United States at, or immediately prior to, the date of importation, of articles of that class or kind to which the imported articles belong, and the controlling use is the chief use, i.e., the use which exceeds all other uses (if any) combined;

The inquiry can be distilled into two issues:

> A. ascertaining the class or kind into which the importations belong; and
>
> B. ascertaining the chief use in the United States of the class or kind at the time of importation.

The plaintiff proposes that the relevant class be termed all thin-walled wear sleeves or at least all wear sleeves, i.e., all cylindrical metal products whose function it is to restore worn shafts. In contrast, defendant would define the class as all shaft seals, i.e., all products whose function it is to effect a seal around a shaft. The correct choice of class, wear sleeves versus shaft seals, is important, for that choice will affect the later determination of chief use.

The parties correctly direct this Court to the decision in *United States* v. *Carborundum Co.*, 63 CCPA 98, C.A.D. 1172, 536 F.2d 373, *cert. denied*, 429 U.S. 979 (1976) as the starting point in the analysis. The *Carborundum* factors for determining class or kind include:

(a) general physical characteristics of the merchandise;

(b) recognition of use of the class in the trade;

(c) channels of trade in which the merchandise moves;

(d) environment of sale; and,

(e) expectation of ultimate purchasers.

*Carborundum*, 63 CCPA at 102; 536 F.2d at 377.

The plaintiff explains that a wear sleeve is a repair device for worn shafts. Its function is to provide a new, smooth surface upon which an oil seal can make proper contact. The defendant argues that the wear sleeve and oil seal (along with other shaft seals) should be placed in the same category due to three broad contentions it advances. Firstly, the oil seal and wear sleeve both perform a "sealing" function in conjunction with a rotary shaft. In other words, the oil seal forms a "seal" with the shaft to keep in lubricants and to keep out unwanted dirt and moisture. Similarly, the defendant argues, the wear sleeve forms a "seal" with the shaft it is repairing. Secondly, replacement of the wear sleeve has traditionally also meant that the user would replace the oil seal. Thirdly, in trade literature, seals and sleeves often appear together. Thus, seals and wear sleeves, in defendant's view, are marketed to the same consumers in similar channels of commerce.

In spite of defendant's attempt to use the term "sealing" in multiple contexts, there are basic differences between sleeves and seals

which cannot be obscured.[6] The wear sleeve is generally fixed to the shaft, which rotates in relation to the seal. The seal is a more complex structure, sometimes containing non-metal parts, and often not attached directly to a shaft. While defendant chooses to term the function of both articles as "sealing," the function of the sleeve is best understood as rebuilding the worn surface of a shaft to allow the seal to properly perform its "sealing" role. When this is clear, it becomes obvious why, as part of its marketing strategy, plaintiff promotes thin-walled wear sleeves in conjunction with oil seals. Sale of a wear sleeve will also give plaintiff an opportunity to sell an oil seal since the oil seal is often replaced when a wear sleeve is installed.[7] This, however, does not support the contention that the two articles are of the same class. References to wear sleeves and oil seals juxtaposed in marketing literature are designed as consumer aids to assist in matching sizes of the two products whenever both are purchased.[8] In its instructional materials, plaintiff lists seals and wear sleeves separately.[9] The two may both be used in conjunction with a shaft but are different articles and are promoted as such.

On the matter of trade usage, in its lone affidavit, defendant relies on the fact that plaintiff is listed as a maker of seals in the Thomas Register, a recognized trade directory. Plaintiff explains that it is listed as a maker of seals since it prefers to be listed under the category representing its principal business. Wear sleeve sellers are in fact listed under a separate heading entitled "shaft sleeves." For example, another corporation, Federal Mogul, which markets wear sleeves purchased from CR Industries, is listed under the category of shaft sleeves. Indeed, the current edition of the Register has a separate listing for wear sleeves cross-indexed to the listing for "sleeves: shaft." Thus, no matter how plaintiff is listed, the Thomas Register does recognize a category termed wear sleeves.

In sum, the Court is unconvinced that there exists a material issue as to the class to which the importations belong. At best, defendant has demonstrated that wear sleeves and shaft seals are sometimes listed together in the same literature. This does nothing to negate the substantial differences in appearance, function, and use, which unequivocally separate the two groups. Similarly, there is no bona fide dispute as to chief use. Plaintiff's unrebutted averment is

---

[6] This is demonstrated in Plaintiff's Exhibit F, entitled CR Speedi-Sleeve/Seal Kits. The sleeve and seal each have a different appearance, and are packaged separately.

[7] It *should be noted that use* of Speedi-Sleeve, plaintiff's patented thin-walled wear sleeve, as opposed to use of a traditional thick-walled sleeve, allows the shaft to be repaired without change of an oil seal. Use of the wear sleeve is not equivalent to replacing an oil seal, it is an alternative to refinishing the worn surface of the shaft.

[8] *See Plaintiff's Exhibit O,* 1981 CR Industries Automotive Program, explains the relation of the Speedi-Sleeve wear sleeve to the oil seal:

Repairing a worn shaft with a Speedi-Sleeve is more than just economical and fast * * *. And a sleeved shaft will even accept the same size seal as the original shaft—which makes it convenient.

*To make it even more convenient, the appropriate Speedi-Sleeve size is listed in every CR seal catalog next to each seal listing.*

[9] *See Plaintiff's Exhibit B,* CR Handbook of Seals, which lists seals in Section One and then places wear sleeves in Section Two with subsections for thin-walled (Speedi-Sleeve) and large diameter wear sleeves.

*See Plaintiff's Exhibit C,* CR Industries Shaft Seals: A Self-Study Program, Heavy-Duty Fleet Edition includes CR Scotseal and Speedi-Sleeve.

In this manual, plaintiff devotes the first seven chapters to a discussion of seals and then presents a separate chapter on wear sleeves.

that approximately 90% of all wear sleeves are used in on-highway motor vehicles. Defendant does not contest that proposition; it only alleges that shaft seals do not have the requisite chief use. That would only be significant if the relevant class were shaft seals which, as discussed previously, it is not.

Plaintiff has sustained its burden of proving the correct classification of the subject merchandise, and because there is no material fact question as to either the class to which Speedi-Sleeve belongs nor to the chief use of that class, summary judgment is granted in plaintiff's favor on this issue.

CONCLUSION

For the foregoing reasons, the Court holds as follows:

(a) there is no jurisdiction over plaintiff's uniform existing practice claim and therefore it is dismissed;

(b) as a matter of law, the merchandise cannot constitute an entirety and therefore defendant's cross-motion for summary judgment is granted as to that issue;

(c) as a matter of law, the cup component is properly classified as "other hand tools of iron or steel" pursuant to item 651.47, TSUS, and therefore defendant's cross-motion for summary judgment is granted as to that issue;

(d) as a matter of law, the sleeve component is properly classified as "parts of the foregoing motor vehicles" pursuant to item 692.32, TSUS, since it belongs to the class or kind of wear sleeves whose chief use is in on-highway motor vehicles. Therefore, plaintiff's motion for summary judgment is granted as to that issue. So ORDERED.